1  MONIQUE C. WINKLER (Cal. Bar No. 213031)
     winklerm@sec.gov
2  SUSAN F. LAMARCA (Cal. Bar No. 215231)
     lamarcas@sec.gov
3  MARC D. KATZ (Cal. Bar No. 189534)
     katzma@sec.gov
4  REBECCA LUBENS (Cal. Bar No. 240683)
     lubensr@sec.gov
5  ERIN E. WILK (Cal. Bar No. 310214)
     wilkse@sec.gov
6
   Attorneys for Plaintiff
7  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
8  San Francisco, CA 94104
   (415) 705-2500 (Telephone)
9  (415) 705-2501 (Facsimile)

10

11                    **UNITED STATES DISTRICT COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA**

13                    **SAN FRANCISCO DIVISION**

14

15  SECURITIES AND EXCHANGE COMMISSION,      Case No.

16                Plaintiff,

17         vs.                                **COMPLAINT**

18  CARRIE L. TOLSTEDT,

19                Defendant.

20

21

22      Plaintiff Securities and Exchange Commission (the "SEC") alleges:

23                    **SUMMARY OF THE ACTION**

24      1.  For several years, Wells Fargo & Company ("Wells Fargo" or the "Company")

25  publicly claimed that its business strategy was to sell to existing retail banking customers products

26  that they needed, wanted, and used, and that it was able to measure its success through its

27  published "cross-sell metric" featured in its Annual Reports and public filings.  Wells Fargo

28  publicly touted its cross-sell metric as a key business indicator that captured the products it had

sold to customers that they needed, wanted, and used.  According to Wells Fargo, the cross-sell metric was supposed to represent the average number of products sold to households that had "the potential for revenue generation and long-term viability."

2.   Defendant Carrie L. Tolstedt, who served as the Senior Executive Vice President of Community Banking for Wells Fargo, publicly discussed the cross-sell strategy, and the reported metric, as an important means for investors to distinguish Wells Fargo from its banking competitors.

3.   Contrary to these public statements, Tolstedt and Wells Fargo's Community Bank—its largest operating segment—implemented a volume-based sales model in which employees sold volumes of products to existing customers, often with little regard to actual customer need or expected use.  For several years, until mid-2016, Wells Fargo opened millions of accounts or sold products that were unauthorized or fraudulent, and others that were unneeded and unwanted by retail banking customers.  The unused accounts and products were included in the Community Bank's cross-sell metric, sometimes for years.

4.   Defendant Tolstedt misled investors and the public as to the value of Wells Fargo's securities through false and misleading statements and by repeatedly providing misleading sub-certifications as to the accuracy of the Company's required quarterly and annual reports to shareholders.  These sub-certifications resulted in misleading statements being disseminated to investors in the Company's quarterly and annual reports.  Consistent with Wells Fargo's materially misleading public statements in its annual and quarterly reports, Tolstedt publicly described the cross-sell metric as a means of measuring Wells Fargo's relationships with its customers.  Yet, as Tolstedt knew or was reckless in not knowing, the cross-sell metric appeared to be growing for years as it captured growth in products that resulted from rampant sales misconduct rather than measuring products that customers wanted, needed, and used.

5.   In late 2013, some of Wells Fargo's aggressive and fraudulent sales practices began to surface through media reports, causing growth of the cross-sell metric to stall.  By May 2015, Wells Fargo faced the first of a series of government actions when the City of Los Angeles sued the Company based on certain sales practices in the Los Angeles area.  Yet Tolstedt continued,

through mid-2016, to publicly endorse the cross-sell metric to investors, while internally studying ways to eliminate the substantial number of idle or unused accounts that had kept the cross-sell metric from growing since early 2014.

6.    Rather than reveal to investors the extent to which the inclusion of unused, unneeded, and unauthorized accounts in the cross-sell metric had inflated the reported number, Tolstedt continued to falsely claim that Wells Fargo's cross-sell strategy was to sell products that customers valued and used.  At the same time, Tolstedt also sold shares in Wells Fargo, which she owned either directly or indirectly, and profited.  For instance, in November 2014, Tolstedt sold shares of Wells Fargo stock for more than $11.8 million.

7.    In September 2016, Wells Fargo announced settlements with two federal agencies, the Consumer Financial Protection Bureau ("CFPB") and the Office of the Comptroller of the Currency ("OCC"), and a settlement with the City of Los Angeles, of actions taken by the three governmental entities to address sales misconduct.  Shortly thereafter, the market price of Wells Fargo's securities declined materially, reducing the Company's market capitalization by billions of dollars as the market learned of the extensive misconduct.  Tolstedt departed from Wells Fargo that month.

8.    The SEC seeks an order from the Court enjoining Tolstedt from future violations of the securities laws; prohibiting Tolstedt from acting as an officer or director of any public company; requiring Tolstedt to pay a civil monetary penalty, and disgorgement of ill-gotten gains or unjust enrichment with prejudgment interest thereon; and providing for other appropriate relief.

**JURISDICTION AND VENUE**

9.    The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

10. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, [15 U.S.C. § 77v(a)], and Section  27 of the Exchange Act [15 U.S.C. § 78aa].

11. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses

of business alleged in this complaint.

12. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in the Northern District of California.

13. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division because a substantial part of the events or omissions which give rise to the claims alleged herein occurred in San Francisco County and defendant maintains a residence in San Francisco.

## DEFENDANT

14. Carrie L. Tolstedt, age 60, resides in San Francisco, California and Scottsdale, Arizona. Tolstedt was an Executive Officer of Wells Fargo, and served as Senior Executive Vice President of Community Banking at Wells Fargo from June 2007 until July 2016, shortly before she left the bank. Tolstedt was compensated in the form of salary, equity awards, and other incentive compensation, among other things.

15. During the investigation conducted by the staff of the SEC preceding this action, Tolstedt asserted her Fifth Amendment privilege in response to questions regarding the same subjects that comprise the allegations in this complaint. Also during the investigation, Tolstedt entered into agreements by which she agreed that the running of any statute of limitations applicable to any action or proceeding against Tolstedt by the SEC, including any sanctions or relief that might be imposed, is tolled and suspended for the period beginning on May 20, 2019 through December 9, 2020.

## RELEVANT ENTITY

16. Wells Fargo & Company is a Delaware corporation based in San Francisco, California. Wells Fargo's common stock is registered under Section 12(b) of the Exchange Act, and its securities are quoted on the New York Stock Exchange under the ticker "WFC."

# FACTUAL ALLEGATIONS

**A.**   **Wells Fargo Touts Its Business Strategy of Cross Selling, and the Key "Cross-Sell" Metric the Community Bank Used to Measure Its Success**

17. As a public company, Wells Fargo filed with the SEC annual and quarterly reports that are publicly-accessible, and made and filed other frequent public announcements.  Among the required information, the Company reported annually and quarterly to its shareholders management's analysis of how the Company and its operating segments, such as the Community Bank headed by Tolstedt, had executed on business strategies.

18. In its quarterly and annual reports, during 2014, 2015, and 2016, Wells Fargo's management described, as a core business strategy, that it sought to increase sales of products and accounts to its customers through what the Company termed a "cross-sell" strategy.  In particular, Wells Fargo characterized the core business strategy in its Community Bank as "needs-based" cross-sell.  In its 2014 Annual Report, the Company described the strategy as "increas[ing] the number of products our customers *use* by offering them all of the financial products that satisfy their financial *needs*." (Emphasis supplied.)

19. To further explain to shareholders, and to the public, its "needs-based" cross-sell strategy, in these required reports Wells Fargo referred to and incorporated its Vision & Values statement, which was prominently displayed on its website.  Wells Fargo's Vision & Values statement in 2015 proclaimed:  "Our vision has nothing to do with transactions, pushing products, or getting bigger for the sake of bigness… We do not offer products that are inappropriate for our customers' needs and circumstances."  Reinforcing this statement, in its 2015 Annual Report, Wells Fargo stated:  "Our approach to cross-sell is needs-based as some customers will benefit from more products, and some may need fewer."

20. The Company pitched the cross-sell strategy to investors as a foundation of its revenue model.  Wells Fargo further informed investors that it used a performance metric to calculate the number of products per household that Community Bank customers used, which it called the "cross-sell metric."  Wells Fargo claimed the cross-sell metric that purportedly measured the cross-sell strategy's success was a leading indicator of revenue and earnings and a centerpiece

of its growth strategy for the Community Bank.

21. For example, in its 2014 Annual Report to shareholders, Wells Fargo described its cross-sell strategy as "key to our ability to grow revenue and earnings especially during the current environment of slow economic growth and regulatory reform initiatives."  Indeed, in each of its required quarterly and annual reports filed with the SEC from 2014 through the second quarter of 2016, Wells Fargo reported the cross-sell metric for the Community Bank.  In addition, Wells Fargo typically explained how the cross-sell metric compared to prior quarters or annual periods.

**B.      Sales Incentives Linked to the Cross-Sell Strategy Spur Banker Fraud that Falsely Inflated the Reported Metric**

22. The Community Bank, which Tolstedt led from 2007 through mid-2016, was the largest of Wells Fargo's three business units, contributing more than half (and in some years more than three-quarters) of the Company's revenue.  For the majority of this period, including from 2013 through 2015, Tolstedt reported directly to the Chief Executive Officer.  In late 2015, Tolstedt began to report to the President, who in turn reported to the CEO.

23.  The Community Bank was responsible for the everyday banking products sold to individuals and small businesses, including checking and savings accounts, certificates of deposit ("CDs"), debit cards, as well as more complex products.  The Community Bank was also responsible for managing the large network of bank branches, referred to within Wells Fargo as "stores," as well as other sales channels through which Wells Fargo offered its products.

24. The branches employed, among others, bankers who were generally responsible for offering accounts and financial products or services to customers.  The bankers reported up through managers of the branches to Regional Bank Executives, who reported to Tolstedt.  In addition, the persons who managed the various groups organized around products that the Community Bank offered also reported up to Tolstedt.

25. The Community Bank also had financial and risk officers who reported to Tolstedt and assessed the Community Bank's business progress and its risks.  Those persons provided information to the financial and risk officers for the Company overall, often after first discussing the information with Tolstedt.  In addition, at least quarterly, Tolstedt met with the CEO, and

frequently others, to discuss the business of the Community Bank and to make strategic plans. In these meetings, Tolstedt discussed the cross-sell strategy, and reasons for upward and downward trends in the cross-sell metric.

26. Through 2013, the Community Bank, led by Tolstedt, implemented a volume-based sales model, which included sales and compensation plans that pressured bankers to sell products to existing customers, often without regard for any actual customer need or use. Regional Bank Executives, managers, and front line bankers repeatedly raised objections to sales plans that left bankers little option but to sell unneeded products to customers. Complaints about the sales goals were regularly escalated to Tolstedt. The complaints specifically articulated that the sales goals were too high and that the goals, along with management pressure, incentivized employees to sell low-quality or valueless, duplicate products, sometimes through misconduct.

27. For instance, in a June 2014 resignation email to Tolstedt and others, the resigning banker complained about multiple checking accounts being opened for individual customers and business package accounts that were not suitable to the customers' needs, explaining: "When tellers and bankers are stating repeatedly that they are only doing what their managers are instructing them to do, there should be a closer look at the practices of retail managers, district managers and area presidents. There are numbers that need to be met but meeting those numbers at the expense of our customers, profitability and our shareholders is not good business. … There are rampant practices to manipulate numbers. . . . I have spent a majority of my time here at Wells Fargo closing accounts for customers. Reviewing profiles with more than 4 or 5 checking accounts which are opened and closed within months. Businesses with package accounts that are not suitable to their needs."

28. Indeed, thousands of Wells Fargo employees engaged in unlawful conduct to sell products of no or low value to customers. Between 2011 and 2016, tens of thousands of employees were the subject of allegations of unethical sales practices, and more than 5,300 employees were terminated for customer-facing sales ethics violations, including falsifying bank records; more than 23,000 employees were referred for sales practices investigations and thousands received disciplinary action short of termination or resigned prior to the conclusion of

the Company's investigations into their sales practices.

29. Many of the unethical or illegal sales practices were referred to as "gaming" within Wells Fargo.  Those gaming practices included, among others:  employees' creation of false records and forgery of customers' signatures to open accounts that were not authorized by customers; employees' alterations of customer phone numbers, email addresses, or physical addresses on account opening documents, either to prevent customers from finding out about unauthorized accounts, or to prevent customers from being contacted in customer satisfaction surveys; employees' transferring funds from existing accounts of customers, without their consent, to a newly-opened but unauthorized account, in order to meet the funding criteria required to receive credit for "selling" the new account.

30. When the Community Bank set employee annual sales goals at a level to achieve year-over-year sales growth, the base level of sales from the prior year included accounts or financial products resulting from unlawful misconduct or gaming.  This had the effect of imposing additional pressure on employees to continue gaming practices.

31. During weekly meetings with Tolstedt, and in meetings with her deputies who described the discussions to Tolstedt, Regional Banking Executives pointed to the sales goals and incentive plans put in place by Tolstedt as leading to low-quality sales of products that went unused by customers.  However, Tolstedt deflected criticism of the sales model and incentive system, and was unwilling to change how sales were measured, fearful that such changes would adversely impact the cross-sell metric.

32. As Wells Fargo discovered misconduct by front line bankers through 2013, the Company frequently fired the bankers but rarely made changes designed to address the sales goals, incentive plans, and managerial pressure that caused the misconduct.  In 2013, the Community Bank under Tolstedt's leadership fired more than a thousand employees for sales misconduct, as it had during the prior year.

**C.     Tolstedt Manages the Community Bank's Reported Cross-Sell Metric**

33. Tolstedt was in charge of, and closely involved in, the decision-making for the Community Bank's calculation of its cross-sell metric.

34. Accounts and financial products opened without customer consent or pursuant to gaming practices were included in the Community Bank cross-sell metric until the point when such accounts were eventually closed—for some products, months or years later—for lack of use. Similarly, accounts and financial products that were never or seldom used by customers were also included by the Company in the Community Bank cross-sell metric until such accounts were eventually closed for lack of use, at which time those accounts were removed from the cross-sell metric.

35. Indeed, unauthorized and other unused accounts were frequently counted in the cross-sell metric for months or years before they were removed.  In some cases (like checking or savings accounts), the unused accounts were closed relatively quickly (usually within 90 days if unfunded).  But for other products such as debit cards, which was the largest product category included in the cross-sell metric, the unused accounts remained open without activity for up to four years.

36. Tolstedt exercised approval over decisions regarding potential changes that would impact the cross-sell metric, such as decisions regarding when to "purge" or remove groups of products from the metric.  For instance, with Tolstedt's knowledge and approval, purges of unused accounts were at times delayed in order to minimize the impact on the reported cross-sell metric, including by pairing the purges with other events that caused an increase in cross-sell.

37. Thus, in late 2013, Tolstedt acknowledged to senior management at Wells Fargo that measuring and managing cross-sell appropriately would require ensuring that low-quality sales of products that customers did not use or value were either automatically purged out of the metric, or "never get into the count."  She explained that such controls were important to ensure that the cross-sell metric remained meaningful to shareholders.  But, as Tolstedt was aware, the Community Bank did not regularly purge low-quality products from the metric or otherwise prevent significant amounts of those products from being included in the count.

**D.      Media Reports of Sales Misconduct Lead to Scrutiny and Lower Sales**

38. In October 2013, the *Los Angeles Times* reported that Wells Fargo had fired approximately 30 employees in the Los Angeles area for sales-related misconduct.  In forwarding the article to the CEO, Tolstedt alerted him:  "This is not a good article."

39. The *Los Angeles Times* continued its reporting in a December 2013 article that stated that its sources included "28 former and seven current Wells Fargo employees who worked at bank branches in nine states, including California," and internal bank documents.  The *Times* detailed practices such as bankers ordering credit cards without customers' permission, forging client signatures, and begging their own family members to open "ghost accounts."

40. Shortly after the first article was published, Tolstedt participated in a meeting with senior officers of Wells Fargo and other leadership of the Community Bank in which they discussed the estimated number of employees who were fired by the Community Bank for sales misconduct, which was approximately 1,000 or more annually or roughly one percent of the number of bankers.  As Tolstedt was aware, the number of employees dismissed annually did not account for the far larger number of persons who were investigated for such practices but not fired, either because they resigned while under investigation or were disciplined less harshly.

41. The *Los Angeles Times* reporting affected the Community Bank, as it saw a significant decrease in sales immediately after the December 2013 article.  Employees of the Community Bank closely watched sales data over the ensuing quarter, in order to report to the information to Tolstedt.

**E.      Tolstedt Affirms Misleading Cross-Sell Claims in Public Statements**

***Tolstedt Misleadingly Describes Cross-Sell at 2014 Investor Day Conference***

42. During the first quarter of 2014, Tolstedt learned that growth in the cross-sell metric had "flattened" due to a decrease in sales of new products, which was itself due in large part to the chilling effect of the revelations by the *Los Angeles Times*.

43. The decline in sales was linked to the attention within Wells Fargo to the media reports, which led to pressure from the board of directors, the Corporate Risk Officer, and from the bank's primary regulator (the OCC) to curb bad behavior resulting from aggressive sales goals.  By

the beginning of May 2014, Tolstedt was made aware of data that showed that the cross-sell metric appeared to be declining.

44. Tolstedt discussed this phenomenon repeatedly with her top deputies during the first quarter of 2014.  For instance, Tolstedt learned from her staff that the number of sales had decreased, but that a measurable portion of the decline was due to improvements in sales quality; in other words, fewer accounts showed signs of so-called low quality—lack of authorization or use.  Her staff recommended that the sales plan reflect these lower numbers to comport with this new reality.

45. Further, Tolstedt and her staff discussed during the first few months of 2014 the fact that the slowdown in growth in the cross-sell metric presented a challenge in communicating the cross-sell strategy to investors.  Tolstedt asked her team to estimate what percentage of reduced sales were "empty" or not used by the customer, so that they could understand the effect on the cross-sell metric.

46. By May 2014, Tolstedt was completing preparations for the important "Investor Day" Conference that Wells Fargo hosted every other year.  The 2014 Conference was scheduled to occur over several hours on May 20, 2014, in San Francisco, and was expected to be attended by numerous large investors, as well as by securities industry analysts who followed Wells Fargo's stock closely and who wrote about Wells Fargo in their communications with their own investor clients.  The highest levels of management at Wells Fargo—including the CEO, the Chief Financial Officer, the Chief Operating Officer, and Tolstedt as head of Community Banking— were slated to provide details for the attendees regarding the Company's achievements over the prior two years and its strategies going forward.

47. In preparing for the 2014 Investor Day Conference, in May 2014, Tolstedt provided senior officers at Wells Fargo with the slide presentation she intended to use to present on behalf of the Community Bank during the Investor Day Conference.  The slides reiterated that cross-selling to customers remained a core business strategy, and emphasized that the purpose of cross-selling was to satisfy customers' "needs."  The slides also touted "growth" in the cross-sell metric, using data over a two-year period.

48. In contrast to the emphasis on customer "needs" in the slides, and the claims to recent growth in the cross-sell metric, Tolstedt revealed to Wells Fargo senior officers that she had concluded that a very different phenomenon was influencing the cross-sell metric.  According to Tolstedt, she was managing how her team talked about cross-sell, because she saw that "our cross-sell will flatten" and that it "could decrease some."  Further, in forwarding the slides to others in management, Tolstedt described that the flattening and likely decrease in the metric was due to the fact that sales levels were down due to changes the bank made to address poor sales quality, alluding to the firings in Southern California.  Tolstedt also described the fact that the metric included products that were not used, or for which usage and profits were "low," but she assured the management team that those products were "rolling off" the metric.  Tolstedt reiterated that the Community Bank's "cross-sell could weaken some" and estimated that it would take a year to eighteen months to "get through" the trend.

49. Finally, as Tolstedt acknowledged in her internal communications within Wells Fargo, the slide presentation did not capture the known causes for the weakening and likely decline in the cross-sell metric.

50. A few days prior to the Investor Day Conference, Tolstedt informed her staff that she expected a question about the cross-sell metric and why "the pace of growth appears to be slipping" from an analyst who followed Wells Fargo's stock.  At the May 20, 2014 Investor Day Conference, the analyst did ask Tolstedt, as expected, to explain the apparent slowdown in growth of the cross-sell metric, including the observation that "[i]t looks like the pace of cross-sell from 2012 to 2013 from 6.1 products to 6.2 products, that's the slowest percentage increase on a core basis in a couple decades."

51. In response, Tolstedt stated:

> When you think about cross-sell, there's many things that influence our cross-sell rate over time. Over different cycles we have seen the pace of growth change, and that is really to be expected. Let me give you a couple of examples that can impact your cross-sell.
>
> CDs. In times where our customers choose that they would rather have their money in a savings account at Wells Fargo, they will close the CD. That will impact our cross-sell rate. Home equity loans. There's times at which they will refinance their first, fold in their home equity loan, and that will

impact our cross-sell. All really good for Wells Fargo and will change over time.

Another impact of cross-sell over time can easily be, if our household growth is faster, we will bring in a new household at three or four products where our existing base as it sits. None of this is unexpected; none of this is bad news. In fact, we are very excited about our cross-sell.

When you think about the seventh and eighth product being twice as more profitable than the first four and the fact that our cross-sell rate will grow a little bit slower than certainly our profit per household will be. We are bullish on cross-sell, we are confident on cross-sell, and we still believe that we can get to an eight cross-sell.

52. Tolstedt's response to the question posed by the analyst was materially misleading. Though Tolstedt chose in responding to offer reasons why the cross-sell metric *could* slow, entirely absent from her response were the reasons that she understood that growth in the metric *had* slowed: namely, the efforts by Wells Fargo to address sales misconduct and the reactions by Wells Fargo bankers to those efforts.  Providing a truthful answer to investors would have linked the effects of the sales practices misconduct to the cross-sell metric.

53. Tolstedt further touted the cross-sell metric as purportedly showing growth and indicating future revenue growth during the Investor Day Conference, despite the misgivings she had, which she had shared internally at Wells Fargo, about the slowdown in its growth.  In her prepared remarks she thus stated: "The beneficial cycle of cross-sell continues.  The more products the customers have with us, the better deal and greater value we can provide.  The more business they do with us, the longer they stay with us, giving us more opportunities to provide products they might need over a lifetime.  Our retail bank cross-sell is now at 6.17 products, up from two years ago 5.98, and at the time of the merger [with Wachovia in January 2009] we were at 5.2.  Our long-term goal continues to be an average cross-sell of 8 and achieving this goal will come with higher household purchase rates and growth in profitability."

54. From Tolstedt's slanted presentation, investors were led to believe that Wells Fargo was executing its cross-selling strategy as intended, and that its results were strong.  Indeed, the analyst who specifically asked about the cross-sell strategy and metric issued a report the following day that reiterated:  "The main revenue opportunity in the Community Bank continues to be cross-

selling," and further summarized points raised by Tolstedt; of course, no mention was made of the effects of sales misconduct on the metric.

### *Tolstedt Provides False Sub-Certification of Second Quarter 2014 Report*

55. After the Investor Day Conference, Tolstedt continued to speak internally at the bank about her concerns regarding the decline in the cross-sell metric, including her concern that investors might conclude the decline was related to the sales misconduct issues.  Through the summer months in 2014, Tolstedt worked closely with her staff to remain apprised of the level of the metric.

56. During this period, Wells Fargo reported no growth in the cross-sell metric in its public filings.  Thus, on August 6, 2014, Wells Fargo described in its quarterly report filed on Form 10-Q for the second quarter (ended June 30, 2014) that the Community Bank cross-sell metric was 6.17 as of May 2014.  The reported 6.17 figure was the same figure that Wells Fargo had reported for the Community Bank's cross-sell metric during its first quarter (ended March 31, 2014).

57. Tolstedt was well aware of the reported cross-sell metric in Wells Fargo's second quarter 2014 Form 10-Q, as she closely reviewed the disclosures in the Form 10-Q before it was filed with the SEC.  Indeed, Wells Fargo employed a process each quarter in which Tolstedt was required to review and provide input to ensure the accuracy of the information reported about the Community Bank.  To indicate her completed review and approval of the information as presented, Tolstedt was also required to certify to the accuracy of the information.

58. To do so, each quarter, Tolstedt was supplied a draft of the quarterly or annual report, and specific information about the sections of the report that she needed to review, and if necessary, to edit.  Tolstedt was informed that she was provided the draft report in order to affirm the accuracy of the information and to make any needed changes.  Based on her experience with dozens of quarterly and annual reports, by 2014 Tolstedt knew that her sub-certification of the accuracy of a draft report would result in the dissemination to investors of the information about the Community Bank.  Thus, in or around late July 2014, Tolstedt received from the Community Bank's controller's office the draft quarterly report for the second quarter of 2014 (ended June 30,

2014).  In addition to a printed copy of the draft quarterly report, Tolstedt was also provided by email an outline of the areas of particular interest to her, and areas that had changed from prior reporting periods.

59. Tolstedt reviewed closely the portions of the second quarter 2014 report on Form 10-Q that related to the Community Bank, including the cross-sell metric.  For instance, during discussions at the end of July 2014 with the Community Bank's controller, Tolstedt asked questions about Wells Fargo's disclosures regarding the cross-sell metric and strategy.  Tolstedt stated as well:  "Reminder:  We need to watch how we use cross-sell.  Right now, we have some year over year growth but we are flat linked quarter."

60. In early August 2014, Tolstedt received the revised draft of the quarterly report for the second quarter 2014.  On or about August 6, 2014, Tolstedt made a sub-certification in writing to the CEO and to the CFO that "to [her] knowledge based on [her] position with the [Community Bank], the financial and other information provided by the [Community Bank] and recorded in the General Ledger, and the financial and other disclosures separately provided by the Group for the [second quarterly] Report do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading for the periods covered by the Report."  In her sub-certification, Tolstedt stated that she understood that, in signing the second quarter 2014 report on Form 10-Q, the CEO and CFO were relying on her certifications.

61. Tolstedt further affirmed that, "to [her] knowledge based on [her] review of the [second quarterly] Report Draft," the filing did not contain any material misstatements or omissions.  Tolstedt stated in the sub-certification that she understood that "information is 'material' if an investor would consider it important in making an investment decision about the Company's securities or if it would significantly alter the total mix of information available in the marketplace."

62. Notwithstanding Tolstedt's sub-certification, Wells Fargo's second quarter 2014 report on Form 10-Q (for the period ended June 30, 2014), which was filed with the SEC on or around August 6, 2014, was materially false and misleading.  In particular, the report included

several statements, as detailed above, describing the Community Bank's cross-sell strategy as purportedly selling to customers products they needed and wanted, and the metric as purportedly measuring the success of such a needs-based strategy.  In reality, as Tolstedt knew, the reported cross-sell metric of 6.17 as of May 2014 was inflated by accounts and products that resulted from sales misconduct and were not needed or wanted by customers, but were unauthorized or unused.

63. The misleading statements and omissions of fact in Wells Fargo's second quarter 2014 report on Form 10-Q were material.  The report materially misstated to investors the extent to which the inclusion of unused, unneeded, and unauthorized accounts in the cross-sell metric had inflated the reported number.  The report also created the materially false and misleading impression that Wells Fargo's strategy was to cross-sell products that customers valued and used, and it omitted the material fact that the strategy resulted in the inclusion of a significant number of unused, unneeded, and unauthorized accounts.

### Tolstedt Provides False Sub-Certification of Third Quarter 2014 Report

64. Despite the materially inflated cross-sell metric reported by Wells Fargo, Tolstedt remained concerned that the metric reported quarterly would not be well received by investors, because of the perceived "flattening" in the growth of the metric.  Indeed, as the third quarter 2014 was winding up, on or around September 30, 2014, Tolstedt understood that the Community Bank would report, for the first time, a decrease to the cross-sell metric for the third quarter.  While the reported metric for the second quarter 2014 was 6.17, the metric for the third quarter 2014 was 6.15.

65. Wells Fargo thus reported in its third quarterly report filed on Form 10-Q (for the period ended September 30, 2014), which was filed with the SEC on or about November 5, 2014: "We continued our focus on meeting customers' financial needs and creating long-term value for shareholders. Compared with a year ago:  . . . we continued to maintain our solid customer relationships across our company with Retail Banking cross-sell of 6.15 products per household" as of August 2014.

66. Wells Fargo's third quarter 2014 report on Form 10-Q was materially false and misleading, as it presented the cross-sell metric of 6.15 as purportedly measuring the success of a

needs-based strategy, when in reality, as Tolstedt knew, the metric was significantly inflated by accounts and products that were the results of sales misconduct and were not needed or wanted by customers, but were unauthorized or unused.

67. As Tolstedt had done for the prior quarter, she closely reviewed the draft third quarter 2014 report on Form 10-Q, including the representations about the Community Bank's cross-sell strategy and its reported metric, described above, before it was filed.  For instance, Tolstedt asked the Community Bank's controller questions about what disclosures Wells Fargo had made about its cross-sell metric, and Tolstedt questioned whether Wells Fargo should discuss the metric differently going forward in light of the fact that Tolstedt expected that the metric would no longer grow over the coming quarters.  The Community Bank's controller supplied Tolstedt with the disclosure that Wells Fargo had incorporated into the quarterly report and noted that Tolstedt had the opportunity to review and revisit the disclosures made.  Based on her experience, Tolstedt knew that her sub-certification of the accuracy of the draft report would result in the dissemination to investors of the information about the Community Bank in the report to investors.

68. Tolstedt nevertheless confirmed the accuracy of the third quarter 2014 report.  On or about November 5, 2014, she provided her sub-certification that, "to [her] knowledge based on [her] review of the [third quarterly] Report Draft," the filing did not contain any material misstatements or omissions.  Indeed, Tolstedt further affirmed to the CEO and to the CFO that the financial and other disclosures provided by the Community Bank for the third quarter 2014 report on Form 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which the statements were made, not misleading.

69. The misleading statements and omissions of fact in Wells Fargo's third quarter 2014 report filed with the SEC on Form 10-Q were material.  The report materially misstated to investors the extent to which the inclusion of unused, unneeded, and unauthorized accounts in the cross-sell metric had inflated the reported number.  The report also created the materially false and misleading impression that Wells Fargo's strategy was to cross-sell products that customers valued and used, and it omitted the material fact that the strategy resulted in the inclusion of a significant

1   number of unused, unneeded, and unauthorized accounts.

2   ***Community Bank Confirms Misleading Metric in 2014 Annual Report***

3   70. Despite Tolstedt's consideration of potential changes to the reported cross-sell

4   metric in 2014, Tolstedt concluded the Community Bank would not change how cross-sell was

5   reported.  Then, on or around December 29, 2014, Wells Fargo received an inquiry from the

6   Securities and Exchange Commission's Division of Corporation Finance asking:

7   In your quarterly reports, as well as your annual reports and in earnings calls, you
    discuss the fact that your cross-sell program is a key element that management believes
8   will help Wells Fargo meet its strategic goals.  Please provide us with an explanation of
    the methodology you use to calculate the products per household and products per
9   customer metrics, as discussed on page 3, and on pages 44 and 45 of your 2013 Annual
    Report.  Also, please tell us to what extent your methodology for calculating the metric
10  has changed over the last five years.

11  71. Tolstedt received the letter from Wells Fargo's Controller, to whom it had been

12  addressed, shortly after it arrived. The next morning she sent it to two trusted lieutenants of hers,

13  with the subject line: "urgent!" and began her message: "FOR YOUR EYES ONLY. PLEASE DO

14  NOT FORWARD. Confidential." Tolstedt directed her team to help with responding to the query.

15  Over the next two weeks, they prepared a response to the SEC staff on behalf of Wells Fargo,

16  dated January 12, 2015, which stated:

17  Our cross-sell strategy is to increase the number of products our customers utilize by
    offering them all of the financial products they need… We report cross-sell metrics for
18  our Community Banking and Wealth, Brokerage and Retirement (WBR) operating
    segments based on the **average number of retail products used** per retail banking
19  household.  For Community Banking the cross-sell metric represents the relationship of
    all retail products used by customers in retail banking households. (Emphasis added.)
20

21  72. The same language in the response was also included in Wells Fargo's 2014

22  Annual Report filed with SEC with its Form 10-K.  The 2014 Annual Report thus represented that

23  the cross-sell metric for the Community Bank is "based on the average number of retail products

24  *used* per retail banking household." (Emphasis added.)

25  73. Similar to the process Tolstedt followed for the quarterly reports filed earlier in the

26  year, in January 2015, Tolstedt was provided by the Community Bank controller the draft 2014

27  Annual Report with specific reference to the portions of the report that addressed the Community

28  Bank.  As she had done for the quarterly reports, Tolstedt reviewed the 2014 Annual Report

closely.  Based on her experience, Tolstedt knew that her sub-certification of the accuracy of the draft report would result in the dissemination to investors of the information about the Community Bank.

74. On or about February 25, 2015, Tolstedt provided her sub-certification to the CEO and CFO, stating that she had reviewed the 2014 Annual Report and that, "to [her] knowledge based on [her] position with the [Community Bank], the financial and other information provided by the [Community Bank] and recorded in the General Ledger, and the financial and other disclosures separately provided by the Group for the Report do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading for the periods covered by the Report."

75. Wells Fargo filed its 2014 Annual Report and Form 10-K with the SEC on or around February 25, 2015.  In it, Wells Fargo again informed investors that the Company's cross-sell strategy was an important strategy and that the cross-sell metric was monitored to determine whether Wells Fargo was satisfying its customers' needs. Wells Fargo thus described its strategy: "Cross-sell Our cross-sell strategy is to increase the number of products our customers *use* by offering them all of the financial products that satisfy their financial *needs*."  (Emphasis added.) The Annual Report further stated: "For Community Banking the cross-sell metric represents the relationship of all retail products *used* by customers in retail banking households." (Emphasis added.)

76. Wells Fargo also stated in the 2014 Annual Report: "Our retail banking household cross-sell was 6.17 products per household in November 2014, up from 6.16 in November 2013 and 6.05 in November 2012. . . . We believe there is more opportunity for cross-sell as we continue to earn more business from our customers."

77. Wells Fargo's 2014 Annual Report was materially false and misleading.  In particular, the report included the misleading statements, including those set forth above, that described the Community Bank's cross-sell strategy as one that involved selling to customers products they needed and wanted.  Wells Fargo further elaborated, as described above, how its

Community Bank cross-sell metric purportedly measured the success of this strategy by measuring the number of supposedly revenue-generating accounts and products per customer household, which were "used."  In reality, as Tolstedt knew, the reported cross-sell metric of 6.17 was significantly inflated by accounts and products that resulted from sales misconduct and were not needed or wanted or used by customers, but were unauthorized or unused.

78.  The misleading statements and omissions of fact in Wells Fargo's 2014 Annual Report filed with the SEC with its Form 10-K were material.  The report materially misstated to investors the extent to which the inclusion of unused, unneeded, and unauthorized accounts in the cross-sell metric had inflated the reported number.  The report also created the materially false and misleading impression that Wells Fargo's strategy was to cross-sell products that customers valued and used, and it omitted the material fact that the strategy resulted in the inclusion of a significant number of unused, unneeded, and unauthorized accounts.

### *Tolstedt Provides False Sub-Certifications, While Minimizing Sales Fraud to Board*

79.  During the first half of 2015, Tolstedt continued to ask members of her team whom she supervised in the Community Bank to find more information regarding the flattening and decline of the cross-sell metric.  Her team recognized, and discussed with her, that the metric had stalled due to the significant level of unused accounts that had been sold in the past and that were increasingly falling out of the metric and not being replaced by new sales; those unused accounts that remained did not represent new opportunities for revenue or for further sales.  While Tolstedt had many frank conversations with her own staff about how the sales misconduct continued to affect the Community Bank's reported cross-sell metric, Tolstedt's discussions outside of the Community Bank—including to members of the board of directors—were less forthcoming.

80.  In particular, during the spring of 2015, the Risk Committee of the Wells Fargo board of directors sought to learn from Tolstedt the extent of the sales fraud and sales integrity issues at the Community Bank.  The board's Risk Committee was ultimately responsible for overseeing the many sources of risk to the bank, including reputational and operational risks.  The board's Risk Committee was separate and apart from other risk management functions, including an enterprise-wide risk committee, and the risk function of the Community Bank.  The Chief Risk

Officer, who reported to the board's Risk Committee, coordinated with Tolstedt to obtain her appearance at a meeting of the board's Risk Committee on or around April 28, 2015.

81. During the April 28, 2015 meeting, the Chairman of the Risk Committee did not believe that Tolstedt answered the relevant questions to the committee's satisfaction.  As Tolstedt had been informed prior to the meeting, the committee sought information about the extent of the sales misconduct problem that had begun to surface in 2013, including the extent and causes of the problem, and any efforts to address the problems. Tolstedt's presentation failed to address the substance and scope of the sales misconduct, including the types of misconduct that had taken place and the number of accounts likely affected.  As a result, the Chairman requested that Tolstedt make a further presentation at the next meeting of the board's Risk Committee; he also spoke to the CEO and Chief Risk Officer about his dissatisfaction with Tolstedt's presentation.

82. One week later, on or about May 5, 2015, Wells Fargo learned that the City of Los Angeles had sued the Company for harm it claimed Wells Fargo had caused customers related to the sales integrity issues.  As a result of the information received from Tolstedt and the Community Bank, members of the board of directors thought the lawsuit came out of the blue, as it presented a sales integrity problem well beyond anything they had been made aware of.

83. Tolstedt was informed by the CEO that her further presentation to the board's Risk Committee regarding the sales integrity issues was expected to be the first order of business in a meeting on May 19, 2015.  Tolstedt provided a draft of the presentation that she intended to share during the meeting to the CEO a few days before the meeting.  The CEO told her that the Risk Committee would want more supporting information, including the number of Wells Fargo employees terminated for sales practices violations in the past 12 months versus prior periods; the percentage of the sales staff that terminated for bad behavior; how Wells Fargo would make sure it made impacted customers "whole"; and how many accounts were opened or products sold in 2013, 2014, and the beginning of 2015 without the knowledge of the customers.  The CEO was not available to attend the meeting with Tolstedt.

84. Despite the specific information that the CEO informed Tolstedt the Risk Committee wanted to know, Tolstedt's presentation to the Risk Committee in May 2015 lacked

such specifics and focused instead on a subset of conduct.  For instance, Tolstedt's written materials described a particular effort to identify certain sales misconduct violations, which had resulted in a total of approximately 230 terminations of employees.  Not described in those materials were the more than 1,000 employees who were terminated annually for sales integrity violations.  Tolstedt also told the Committee that the incentives used by the Community Bank were not the cause of the problems.  Despite Tolstedt's selective presentation, members of the board considered the sales integrity issues a serious risk to the bank.  Accordingly, the Committee hired a consultant to attempt to determine the scope of the sales problems that they did not learn from Tolstedt.

85. Just as she minimized the sales integrity problems to the board members, Tolstedt continued to provide misleading sub-certifications to the CEO and CFO for the first two quarters of 2015.  Prior to Wells Fargo filing the Forms 10-Q for the first and second quarters of 2015, Tolstedt closely reviewed drafts of each of the reports, including the representations about the Community Bank's cross-sell strategy and its reported metric.  Based on her experience, Tolstedt knew that her sub-certification of the accuracy of the draft report would result in the dissemination to investors of the information about the Community Bank in the report to investors.

86. Nevertheless, for each report, Tolstedt confirmed the accuracy, sub-certifying that, "to [her] knowledge based on [her] review of the Report Draft," the Form 10-Q did not contain any material misstatements or omissions.  Tolstedt provided her further sub-certification that the financial and other disclosures provided by the Community Bank for both the first and second quarter 2015 reports did not contain any untrue statements of material fact or omit to state material facts necessary to make the statements made, in light of the circumstances in which the statements were made, not misleading.  Both sub-certifications for the first and second quarters—dated, respectively, May 6, 2015 and August 5, 2015—were thus false and misleading when made.

87. Thus, on or about May 6, 2015, Wells Fargo filed its first quarter 2015 report on Form 10-Q (for the period ended March 31, 2015) with the SEC in which it claimed, among other things, that its "retail banking household cross-sell was 6.13 products per household in February 2015," and further reiterated that its "approach is needs-based."

88. Similarly, Wells Fargo filed its second quarter 2015 report on Form 10-Q (for the period ended June 30, 2015) with the SEC on or about August 5, 2015, in which it stated, among other things, that its cross-sell strategy was "needs based," and also reported "retail banking household cross-sell was 6.13 products per household in May 2015."

89. Wells Fargo's first and second quarter 2015 reports on Forms 10-Q were materially false and misleading, as each presented the cross-sell metric of 6.13 as purportedly measuring the success of a "needs-based" strategy; in reality, the metric was significantly inflated by accounts and products that resulted from sales misconduct and were not needed or wanted by customers, but were unauthorized or unused.

90. The misleading statements and omissions of fact in Wells Fargo's first and second quarter 2015 reports filed with the SEC on Forms 10-Q were material. The reports both materially misstated to investors the extent to which the inclusion of unused, unneeded, and unauthorized accounts in the cross-sell metric had inflated the reported number. The reports both also created the materially false and misleading impression that Wells Fargo's strategy was to cross-sell products that customers valued and used, and both reports omitted the material fact that the strategy resulted in the inclusion of a significant number of unused, unneeded, and unauthorized accounts.

***Tolstedt Internally Proposes New Metric While Publicly Affirming Inflated Metric***

91. During 2015, Tolstedt tasked her own team to identify other ways to measure and present the cross-sell metric. Tolstedt and her deputies were concerned that "idle" products and "inactive" accounts were the cause of the slow and declining growth in the reported cross-sell metric.

92. Thus, in July and August 2015, Tolstedt's team shared with her analyses they had developed to look at the inputs to the cross-sell metric that distinguished active, or used, accounts from inactive, or unused, accounts. They further identified that, because products such as debit cards could remain in the metric for years with little or no activity, the reported metric included many inactive accounts from periods where the sales misconduct was high.

93. As Tolstedt and her team were completing their analyses for presentation to the Company's senior management, Tolstedt was again asked to make a presentation to the Risk Committee of the board of directors regarding sales misconduct at the Community Bank.  The Risk Committee meeting was scheduled in conjunction with meetings of the Wells Fargo full board of directors meetings, which took place on October 26-27, 2015.

94. As Tolstedt was informed, the Risk Committee also heard a report during the October 25 meeting from the outside consulting firm that had been retained to review the sales misconduct issues.  The consulting firm reported to Wells Fargo's board the weaknesses that needed to be addressed by the Company to manage the ongoing adverse impact from sales misconduct, and recommended, among other measures, that bankers be rewarded based on whether accounts were used, rather than on the number of products sold.

95. Though Tolstedt presented on many of the same issues as the outside consulting firm during the October 2015 meeting, she denied that structural issues were a cause of the misconduct, and Tolstedt did not describe to the board the analyses regarding active and inactive accounts.  The Chairman of the Risk Committee found Tolstedt's presentation inadequate, and in a subsequent meeting with the CEO, he and another board member recommended that Tolstedt be replaced as head of the Community Bank.

96. During the final months of 2015, Tolstedt's team shared with her the results of their analyses regarding the cross-sell metric.  In November 2015, the team presented to Tolstedt a new cross-sell metric that only included active accounts.  Their research concluded that more than 10 percent of household accounts that had been included in the reported cross-sell metric were inactive within a six-month period, and that more than half of retail bank households held at least one inactive account.  Their work demonstrated the sources of the "inactive" or "idle" accounts as well; for instance, debit cards were sold in high volume and thus accounted for 29 percent of total accounts, but 30 percent of the debit cards remained inactive in any given month.

97. Tolstedt and her team presented their findings in January 2016 to the CEO and the COO, recommending the new metric—which they dubbed "active cross-sell"—be ready for

1  presentation publicly by the time of Wells Fargo's 2016 Investor Day conference later in the

2  spring.

3         98. As Tolstedt's presentation explained, the Community Bank should make two

4  changes to its reported cross-sell metric.  One change would redefine the measured "household,"

5  which change, on its own, would have the effect of making the cross-sell metric a larger number.

6  The second, and more significant change, was to include in the number of products counted only

7  those products that customers actively *used*, which change would have the effect of making the

8  cross-sell metric smaller.  To illustrate, the presentation used the data that had been included for

9  the reported cross-sell metric in the third quarter 2015 Form 10-Q, and compared the reported

10  cross-sell metric with the newly-proposed metric:  "Current [Cross-sell]:  6.13     Active Cross-sell

11  5.17."

12         99. Tolstedt and her team thus demonstrated that by restricting the cross-sell metric to

13  products actually "used," the number changed substantially.  Tolstedt and her team also expected

14  that, unlike the then-reported cross-sell metric that was laden with inactive accounts, the "active

15  cross-sell" metric would likely show growth much sooner.

16         100.  At the same time that Tolstedt was discussing—first with her own team, and then

17  with the larger management team—the disparity between the reported cross-sell metric and the

18  number of accounts that were actually used, Tolstedt was called upon to review and sub-certify

19  Wells Fargo's third quarter 2015 report on Form 10-Q, and then Wells Fargo's year-end 2015

20  Annual Report.  Based on her experience, Tolstedt knew that her sub-certification of the accuracy

21  of the draft report would result in the dissemination to investors of the information about the

22  Community Bank in the report to investors.

23         101.  For instance, during her review of the draft third quarter 2015 report, Tolstedt

24  was alerted to changes that had been made to the cross-sell disclosures in the prior quarter Form

25  10-Q, which stated for the first time that some customers would need "more products" and some

26  "fewer."  Although minor edits were made to the third quarter 2015 Form 10-Q to conform the

27  report to the prior revisions, Tolstedt did not revise the disclosures, either in the draft Form 10-Q or

28

in the 2015 Annual Report, to reflect the analyses about the cross-sell metric that she had directed her team to complete for the Community Bank.

102.   Instead, on or about November 4, 2015, Tolstedt confirmed the accuracy of the draft, third quarter 2015 report, and on or about February 24, 2016, Tolstedt confirmed the accuracy of the draft Annual Report.  For each, she provided to the CEO and the CFO her sub-certification that, "to [her] knowledge based on [her] review of the Report Draft," the quarterly and the annual reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which the statements were made, not misleading.

103.   On or about November 4, 2015, Wells Fargo filed its third quarter 2015 report on Form 10-Q (for the period ended September 30, 2015) stating, among other things, that its "cross-sell strategy" was "needs based," and that the Community Bank's "retail banking household cross-sell was 6.13 products per household in August 2015."  Similarly, on or about February 24, 2016, Wells Fargo filed with the SEC its 2015 Annual Report with its Form 10-K for the year ended December 31, 2015, in which it reiterated that its "approach to cross-sell is needs-based."  Wells Fargo further stated that its cross-sell metric tracked the degree to which it satisfied customers' needs, and reported the Community Bank's "retail banking household cross-sell was 6.11 products per household in November 2015."

104.   Wells Fargo's third quarter 2015 Form 10-Q and its 2015 Annual Report filed with its Form 10-K were both materially false and misleading.  Wells Fargo claimed that the reported values for the Community Bank's cross-sell metric, 6.13 and 6.11 respectively, measured retail products used by customers in retail banking households, when, in reality, Tolstedt knew that the reported cross-sell metric contained a significant amount of products that were not used by customers.  As Tolstedt was aware, the reported cross-sell metric was inflated by accounts and products that resulted from sales misconduct and were not needed or wanted by customers, but were unauthorized or unused.

105.   The misleading statements and omissions of fact in Wells Fargo's third quarter 2015 Form 10-Q and its 2015 Annual Report filed with its Form 10-K were material.  Each report

1    materially misstated to investors the extent to which the inclusion of unused, unneeded, and

2    unauthorized accounts in the cross-sell metric had inflated the reported number. Both the quarterly

3    and the annual report also created the materially false and misleading impression that Wells

4    Fargo's strategy was to cross-sell products that customers valued and used, and they both omitted

5    the material fact that the strategy resulted in the inclusion of a significant number of unused,

6    unneeded, and unauthorized accounts.

7                    ***Tolstedt Continues to Promote Misleading Cross-Sell Metric Until Her Departure***

8            106.  Through January and February 2016, Tolstedt and her team prepared for the

9    presentation of the new, "active cross-sell" metric, to be publicly presented during Wells Fargo's

10   2016 Investor Day conference, scheduled for May 2016. Consistent with their presentations

11   internally, the first drafts of their presentation revealed that as much as 20 percent of accounts

12   included in the then-reported cross-sell metric were "inactive." However, by the end of February,

13   the team removed the explicit reference to "inactive" accounts from drafts the team circulated

14   internally, due to concerns that investors would make the connection between "inactive" accounts

15   and the sales misconduct that continued to have an ongoing influence on Wells Fargo's reported

16   metric.

17           107.  By mid-March 2016, Tolstedt's team replaced the term "active cross-sell" with

18   "dynamic cross-sell" in drafts of her expected presentation for similar reasons. Also in early

19   March 2016, Tolstedt met with a securities analyst who followed Wells Fargo's securities closely

20   and who made recommendations to investors about buying, selling, or holding the Company's

21   securities. In the meeting, the analyst was informed that Wells Fargo would cross sell if it added

22   value to customers and "only cross sell products which customers value and will use." Tolstedt

23   failed to disclose during this meeting that many of the accounts and products included in the

24   Community Bank's cross-sell metric were not used by customers.

25           108.  Finally, by the time the 2016 Investor Day conference occurred, on or around

26   May 24, 2016, the Community Bank's presentation was substantially changed from the original

27   conception of introducing the new, "active cross-sell" metric. The written presentation did not

28   include any reference to a new, or revised cross-sell metric. It also did not include any

comparisons between "active" accounts and "inactive" accounts.  Nor did it describe information from which investors could discern that "active" accounts were but a portion of the accounts included in the reported cross-sell metric.

109.  In delivering the presentation for the Community Bank at the 2016 Investor Day conference, Tolstedt was again called upon to answer questions about the decline in the reported cross-sell metric.  In particular, one invited participant observed that the decline in the metric was "a bit of a change" for the Community Bank and asked whether the decline reflected either "an inevitable saturation" or "a need for new products."

110.  In response, Tolstedt acknowledged that there had been "headwinds."  However, she attributed the decline in the cross-sell metric to strong checking account growth, and "the interest rate environment" for causing some products not to be "particularly appealing to our customers right now."  Tolstedt did not mention in her misleading response any of the information about "active" or "inactive" accounts, or the fact that the reported metric continued to decline as "inactive"—that is, unused, unwanted, and unauthorized products that were the result of sales misconduct—slowly rolled off the metric and were not replaced.

111.  Prior to, and shortly after, the 2015 Investor Day conference, Tolstedt closely reviewed, and affirmed the accuracy of, two additional quarterly reports on Forms 10-Q.  Based on her experience, Tolstedt knew that her sub-certification of the accuracy of the draft reports would result in the dissemination to investors of the information about the Community Bank in the reports to investors.  Thus, Tolstedt on or about May 4, 2016, and on or about August 3, 2016, provided her sub-certifications to the CEO and CFO of the first and second quarter 2016 reports, stating for each that, "to [her] knowledge based on [her] review of the Report Draft," the Forms 10-Q did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which the statements were made, not misleading.  Accordingly, Wells Fargo filed its first quarter 2016 report on Form 10-Q (for the period ended March 31, 2016) with the SEC on or about May 4, 2016 and its second quarter 2016 report on Form 10-Q (for the period ended June 30, 2016) on or about August 3, 2016.

112.  In the first quarter 2016 Form 10-Q, Wells Fargo reiterated that its "cross-sell strategy" was "needs based," and claimed that the Community Bank's "retail bank household cross-sell was 6.09 products per household in February 2016."  The Form 10-Q was materially false and misleading, as the reported metric remained significantly inflated by accounts and products that were the results of sales misconduct and were not needed or wanted by customers, but were unauthorized or unused.

113.  In the second quarter 2016 Form 10-Q, Wells Fargo again stated that its "cross-sell strategy" was "needs based," but Wells Fargo stated that it determined to change the Community Bank's cross-sell metric "to include only those households that maintain a retail checking account."  The revised cross-sell metric thus reflected the first of the two changes that Tolstedt had proposed in January 2016.  Yet, the second, more significant change described in January, which would have included only accounts actively *used*, was absent.  As a consequence, Wells Fargo reported an even *higher* value for the cross-sell metric:  "Our Community Banking cross-sell metrics, as revised for prior periods to conform to the current period presentation, were 6.28, 6.32, 6.31, 6.37 and 6.36 as of February 2016, May 2015 and November 2015, 2014 and 2013, respectively."

114.  Wells Fargo's second quarter 2016 report on Form 10-Q was materially false and misleading, as it presented the cross-sell metric of 6.28 as purportedly measuring the success of a strategy that was based on its customers' "needs."  In truth, the metric remained significantly inflated by accounts and products that were the results of sales misconduct and were not needed or wanted by customers, but rather unauthorized or unused.

115.  The misleading statements and omissions of fact in Wells Fargo's first and second quarter 2016 Forms 10-Q filed with the SEC were material.  Each report materially misstated to investors the extent to which the inclusion of unused, unneeded, and unauthorized accounts in the cross-sell metric had inflated the reported number.  Both reports also created the materially false and misleading impression that Wells Fargo's strategy was to cross-sell products that customers valued and used, and they both omitted the material fact that the strategy resulted in the inclusion of a significant number of unused, unneeded, and unauthorized accounts.

116.   Tolstedt knew, or was reckless in not knowing, that the statements she made to the public and Wells Fargo's public statements that she reviewed (and the accuracy of which she sub-certified) in its annual and quarterly reports filed with the SEC during 2014, 2015, and 2016, and in materials incorporated into those reports, regarding the Community Bank's cross-sell strategy and its cross-sell metric were false and misleading.

117.   Tolstedt also knew, or was reckless in not knowing, that her conduct in publicly describing the Community Bank's cross-sell strategy and its metric, and in sub-certifying the accuracy of the annual and quarterly reports during 2014, 2015, and 2016, operated as a fraud or deceit and created a false and misleading impression to Wells Fargo's investors.

118.   At the same time Tolstedt engaged in the above acts and deceptions that sowed misinformation, she also sold shares in Wells Fargo, which she owned either directly or indirectly, and profited.  For instance, in November 2014, Tolstedt sold shares of Wells Fargo stock for more than $11.8 million.

**F.     Wells Fargo Resolves Lawsuits; Tolstedt Departs Bank**

119.   On or around July 12, 2016, Wells Fargo announced, in a release that was filed with the SEC, that Tolstedt was retiring at the year's end, and would leave her position as head of Community Banking as of July 31, 2016.

120.   On September 8, 2016, Wells Fargo announced that it had entered into settlements with governmental authorities including the CFPB, the City of Los Angeles, and the OCC, all related to charges of sales practice misconduct within the Community Bank.  Following the Company's announcement of the settlements, Wells Fargo's stock experienced significant declines in the market value of its shares, decreasing its market capitalization by billions of dollars.

121.   Shortly after the announced settlements, on September 27, 2016, Wells Fargo announced publicly that the Company and Tolstedt had reached an agreement that she "would separate from employment effective September 27, 2016, that Ms. Tolstedt would not exercise any outstanding stock options previously awarded by the Company until the completion of the ongoing investigation being conducted by the Company and its Board of Directors and that, at the

conclusion of such investigation, the Board of Directors would have the authority to determine the extent to which such options will be forfeited."

## FIRST CLAIM FOR RELIEF

### *Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

122. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 121.

123. By engaging in the conduct described above, Defendant Tolstedt and Wells Fargo & Company, each, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

(a)     Employed devices, schemes, or artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(c)     Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

124. By engaging in the acts and conduct alleged above, Defendant Tolstedt knowingly or recklessly provided substantial assistance to Wells Fargo & Company, and to other persons employed by the Company, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

125. By reason of the foregoing, Defendant Tolstedt violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### *Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

126. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 121.

127.   By engaging in the conduct described above, Defendant Tolstedt, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)     With scienter, employed devices, schemes, or artifices to defraud;

(b)     Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)     Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

128.   By reason of the foregoing, Defendant Tolstedt violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

### *Aiding and Abetting Violations of Exchange Act Reporting Requirements*

129.   The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 121.

130.   As an issuer of securities registered with the SEC, Wells Fargo was required to file with the SEC annual and quarterly reports, in accordance with applicable rules and regulations, which included information as necessary to make the statements made in the reports, in the light of the circumstances under which they were made not misleading.  By the conduct described above, Wells Fargo & Company failed to do so, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-13, and 240.12b-20].

131.   By engaging in the acts and conduct alleged above, Defendant Tolstedt knowingly or recklessly provided substantial assistance to Wells Fargo & Company, and to other persons employed by the Company, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-13, and 240.12b-20], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate these provisions.

**FOURTH CLAIM FOR RELIEF**

*Aiding and Abetting Violations of Exchange Act Books and Records Requirements*

132.  The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 121.

133.  As an issuer of securities registered with the SEC, Wells Fargo & Company was required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and disposition of the assets of the Company.  By the conduct described above, Wells Fargo & Company failed to do so, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

134.  aBy engaging in the acts and conduct alleged above, Defendant Tolstedt knowingly or recklessly provided substantial assistance to Wells Fargo & Company, and to other persons employed by the Company, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], and thereby aided and abetted such violations, and unless restrained and enjoined, will continue to violate this provision.

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

**I.**

Permanently enjoin Defendant from directly or indirectly violating Sections 10(b), 13(a), and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), and 78m(b)(2)(A)], and Rules 10b-5, 13a-1, 13a-13, and 12b-20 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-1, 240.13a-13, and 240.12b-20], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Issue an order requiring Defendant to pay disgorgement of ill-gotten gains or unjust enrichment obtained or derived from such violations, and to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**III.**

Prohibit Defendant from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or

1  that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)],

2  pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the

3  Exchange Act [15 U.S.C. § 78u(d)(2)].

4                                          **IV.**

5         Retain jurisdiction of this action in accordance with the principles of equity and the Federal

6  Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees

7  that may be entered, or to entertain any suitable application or motion for additional relief within

8  the jurisdiction of this Court.

9                                          **V.**

10        Grant such other and further relief as this Court may determine to be just and necessary.

11

12  Dated:  November 13, 2020                    Respectfully submitted,

13

14

15                                    */s/ Rebecca Lubens*
                                      REBECCA LUBENS
16                                    Attorney for Plaintiff
                                      SECURITIES AND EXCHANGE COMMISSION
17

18

19

20

21

22

23

24

25

26

27

28