UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>  Plaintiff,<br><br> v.<br><br>CARRIE L. TOLSTEDT,<br><br>  Defendant. | Case No. 20-cv-07987-JST<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: ECF No. 20 |

In this civil enforcement action, Plaintiff the Securities and Exchange Commission ("SEC") brings four claims against Defendant Carrie Tolstedt for violations of Sections 17(a)(1), (a)(2), and (a)(3) of the Securities Act of 1933, and Sections 10(b), 13(a), and 13(b)(2)(A) of the Securities Exchange Act of 1934. Complaint ("Compl."), ECF No. 1.[1] Before the Court is Tolstedt's motion to dismiss count two of the complaint for failure to state a claim for violation of Section 17(a). ECF No. 20. The Court will deny the motion.

**I.  BACKGROUND**

The Court accepts the following allegations from the complaint as true for the purposes of deciding the motion. *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp. 3d 834, 837 (N.D. Cal. 2020).

Tolstedt was the Senior Executive Vice President of Community Banking for Wells Fargo from June 2007 to July 2016. Compl. ¶¶ 2, 14. Wells Fargo publicly claimed that its business strategy was to sell to existing retail banking customers products that they needed, wanted, and used, and that it was able to measure its success through its published "cross-sell metric" featured

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

in its Annual Reports and public filings. *Id.* ¶ 1. Tolstedt promoted Wells Fargo's cross-sell strategy, and the reported metric, to distinguish the company from its banking competitors. *Id.* ¶¶ 2, 20.

The SEC alleges, however, that contrary to her public statements, Tolstedt and Wells Fargo Community Bank "implemented a volume-based sales model" in which employees "opened millions of accounts or sold products that were unauthorized or fraudulent, and others that were unneeded and unwanted by retail banking customers." *Id.* ¶ 3. "The unused accounts and products were included in the Community Bank's cross-sell metric, sometimes for years," and were reported to investors, potential investors, and the public. *Id.* ¶¶ 3-4. Tolstedt exercised authority over whether and when to remove groups of products, including unused accounts, from the cross-sell metric, and she sometimes permitted and approved delayed purges of unused accounts to minimize the impact on the reported cross-sell metric, even though she acknowledged to senior management at Wells Fargo that that measuring and managing cross-sell appropriately would require ensuring that low-quality sales of products that customers did not use or value were either automatically purged out of the metric, or "never get into the count." *Id.* ¶¶ 36-37.

Between 2014 and 2015, Tolstedt gathered information from her staff about the cross-sell metric's decline and the relationship to the number of unused products. *Id.* ¶¶ 42-45, 79. At the same time, she made public statements that materially misrepresented or omitted information about the cross-sell metric. For example, at the 2014 Investor Day Conference, in her answer to an analyst question and in her prepared slide presentation, Tolstedt stated that cross-selling promoted customer product needs but omitted information about why the metric's growth had slowed and made no reference to the sales practices misconduct that was affecting the numbers. *Id.* ¶¶ 47-52. Tolstedt further misled investors by providing sub-certification of the accuracy of the Community Bank's cross-sell metric, leading it to be inaccurately reported in Well Fargo's quarterly and annual shareholder reports. *Id.* ¶¶ 4, 6, 18, 21, 60. The SEC alleges that she knowingly made inaccurate sub-certifications on at least nine occasions between 2014-2016. *Id.* ¶¶ 60, 68, 74, 85, 102, 111.

While she was falsely claiming that Wells Fargo's cross-sell strategy was selling products

used and valued by customers, Tolstedt elected to sell her own shares in Wells Fargo stock. *Id.* ¶ 6. In November 2014, she sold $11.8 million of Wells Fargo stock. *Id.* ¶¶ 6, 118.

On November 13, 2020, the SEC filed this suit against Tolstedt alleging, among other things, that she violated Section 17(a) by fraudulently obtaining money by means of untrue statements or omissions of material fact.[2] *Id.* ¶¶ 126-28. Tolstedt now seeks to dismiss the SEC's Section 17(a) claim. She argues that (1) neither her statements as alleged in the complaint nor the statements by Wells Fargo in its periodic filings were "in the offer or sale" of securities within the meaning of Section 17(a), and (2) the complaint does not allege that Tolstedt obtained money "by means of" any alleged misstatement as required by Section 17(a)(2).

## II.     DISCUSSION

The two issues raised by Tolstedt are "pure, and straightforward, questions of statutory construction," ECF No. 29 at 5, related to the meaning of Section 17(a) of the Securities Act of 1933. That provision states:

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78) of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly–
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 17(a) "was intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading." *United States v. Naftalin*, 441 U.S. 768, 778 (1979).

---

[2] Charges related to sales practice misconduct were also brought by various government authorities against Wells Fargo, the settlement of which was announced on September 8, 2016. Compl. ¶ 120.

3

### A. "In the Offer or Sale of Any Securities"

First, Tolstedt argues that Section 17(a)'s prohibition of acts "in the offer or sale of any securities" limits the statute's applicability to conduct that occurs "during and within an attempt or offer to dispose of" a specific security. ECF No. 20 at 10-11. Applying this construction, Tolstedt argues that neither her alleged statements at the Investor Day Conference nor her sub-certifications of Wells Fargo's periodic SEC filings are "part of a securities transaction" because they were not themselves made as part of an attempt or offer to dispose of a security or conduct a specific securities transaction. *Id.* at 11. The SEC responds that the nexus requirement of Section 17(a) should be interpreted broadly to encompass circumstances like those alleged here where the defendant made material misstatements or omissions during the same time period in which she was trading in the company's securities. ECF No. 26 at 15.

In support of her proposed construction, Tolstedt relies heavily on language in *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996), a case alleging Section 10(b) violations against an auditor. In *McGann*, the court considered the defendant's argument that "under a proper reading of 'in connection with,' only those who actually trade securities are subject to primary liability under [Section] 10(b)." *Id.* at 393. Conducting a textual, structural, and policy analysis, the *McGann* court rejected this argument, holding that "securities trading by the defendant is not a prerequisite to liability under [Section] 10(b)." *Id.* at 394. As part of its structural analysis, the court contrasted Section 10(b) with Sections 12(2), 17(a), and 15, stating that the latter three provisions "impose liability only where the fraud is part of a securities transaction." *Id.* Extrapolating from this statement, Tolstedt contends that the SEC's Section 17(a) claim fails as a matter of law because, although the complaint alleges that she sold Wells Fargo securities during the same period as her alleged misstatements and omissions, the SEC "does not describe any statements made in the course of the transaction." ECF No. 20 at 9.

*McGann* will not bear the weight Tolstedt places upon it. The distinction drawn there was between Section 10(b)'s *lack of requirement* that a defendant have engaged in securities trading and Section 17(a)'s *requirement* that a defendant have engaged in securities trading. *McGann*, 102 F. 3d at 394 ("[A] structural analysis indicates that securities trading by the defendant is not a

4

prerequisite to liability under § 10(b).  At least three securities laws impose liability only where the fraud is part of a securities transaction [including] § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (making it unlawful for any person 'in the offer or sale of any securities' to use fraud)[.]").  In other words, in contrast to Section 10(b), the text of Section 17(a) demonstrates that "when Congress intended that there be a *participation in* a securities transaction as a prerequisite of a violation, it knew how to make that intention clear." *Id.* (emphasis added) (citing *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 860 (2nd Cir. 1968)).  The case does not hold or reason that Section 17(a) liability is limited to material misrepresentations made as a component of a securities transaction, but simply that there must *be* a securities transaction.  The SEC's allegation that Tolstedt sold Wells Fargo shares, Compl. ¶ 118, satisfies the language in *McGann*.

Tolstedt's remaining arguments are similarly unavailing.  She offers a textual analysis of Section 17(a)'s "offer," "sale," and "in."  ECF No. 20 at 10 (citing the definitions of "offer" and "sale" from 15 U.S.C. § 77b(a)(3)).  She notes that the word "in" is not defined in the Securities Act but says that its meaning is well-known as "to be inside of, or within." *Id.* at 10 (citing *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1082 n.8 (9th Cir. 2009)).  Tolstedt then concludes that these terms, so defined, support her interpretation that a Section 17(a) violation is limited to misrepresentations made "during and within an attempt or offer to dispose of, or the actual disposition of, securities for value."  ECF No. 20 at 10-11.  Putting to one side that Tolstedt was allegedly making misrepresentations and omissions at the time she sold Wells Fargo shares, i.e., "during . . . the actual disposition of" the shares, the Court disagrees that the dictionary definitions she affixes to the statutory language lead inevitably to her preferred interpretation, which runs afoul of the Supreme Court's admonition that "Congress expressly intended to define [the statutory terms 'in,' 'offer,' and 'sale'] broadly," such that they are "expansive enough to encompass the entire selling process."  *Naftalin*, 441 U.S. at 773.  Like other courts, at the motion to dismiss phase this Court reads "in the offer or sale of any securities" through that expansive lens.  *See, e.g.*, *SEC v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010).

Tolstedt also compares the text of Sections 17(a) and 17(b).  "Section 17(b) of the Securities Act of 1933 prohibits disseminating information about a security without disclosing any

5

consideration received or to be received, directly or indirectly, in connection with sales of the security." *In re Galena Biopharma, Inc. Derivative Litig.*, No. 14-cv-382-SI, 2014 WL 5410831, at *24 (D. Or. Oct. 22, 2014) (citing 15 U.S.C. § 77q(b)). Tolstedt suggests that because Section 17(b) lists various forms of communication which can be used to describe a security without offering it, Congress therefore intended to exclude periodic reporting from the prohibited ways in which a person is liable for misrepresentation under Section 17(a). ECF No. 20 at 11-12. The Court struggles to understand how Tolstedt's premise leads to her conclusion. Even so, her argument that alleged misstatements or omissions in periodic disclosures cannot be used to satisfy the nexus requirement for Section 17(a) liability is contradicted by other authority before the Court. *See, e.g.*, *SEC v. Wolfson*, 539 F.3d 1249, 1263 (10th Cir. 2008) ("It suffices to note here that [defendant's] misconduct occurred 'in the offer or sale' of securities because the relevant misstatements were contained in filings available to the public at the time [the public company] offered and sold F10 stock to overseas investors.").

Lastly, Tolstedt compares Section 17(a)'s prohibition of conduct "in" the offer or sale of securities to Section 10(b)'s prohibition of conduct "in connection with" the purchase or sale of securities. She urges that "[i]t would make little sense for the same Congress dealing with similar issues as part of interconnected statutory schemes to use 'in' in 1933 and 'in connection with' in 1934, and expect the two phrases to be treated as equivalents." ECF No. 20 at 13 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976)).

The Supreme Court has explained that there is "considerable overlap" between Section 17(a), Section 10(b), and Rule 10b-5. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983), as explaining that "'[i]t is hardly a novel proposition that' different portions of the securities laws 'prohibit some of the same conduct.'"). Moreover, in *Naftalin*, the Court seemed to reject the very argument Tolstedt raises here, explaining that it was "not necessarily persuaded that 'in' is narrower than 'in connection with,'" and observing that both Congress and the Court have used the terms interchangeably." 441 U.S. at 773 n.4 (citing H.R. Rep. No. 85, 73d Cong., 1st Sess., 6 (1933), and *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 (1971)).

6

Both parties point to *SEC v. Softpoint, Inc.* as supporting their respective positions regarding the distinction between Sections 10(b) and 17(a). 958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998). Tolstedt contends that *Softpoint* shows that the SEC's allegations as to her misstatements and omissions during the Investor Day Conference and as sub-certifications on Wells Fargo's periodic filings are insufficient to state a claim. Tolstedt is correct that the *Softpoint* court does indicate that, in contrast to the press releases and quarterly and annual reports that satisfy the nexus requirement under Section 10(b) and Rule 10b-5, the "Form S-8 registration statements were more closely linked to the offer and sale of Softpoint stock, hence they fall within the scope of Sections 17(a)(2) and (3)." *Id.* at 863. The court also stated, however, that the defendant's activities – including the preparation and dissemination of press releases, quarterly and annual reports, registration statements, other public filings, and scheme to inflate the company's income – "fall unmistakably within the broad scope of conduct prohibited by Sections 17(a) and 10(b) and Rule 10b-5 (collectively the 'anti-fraud provisions')." *Id.* at 862; *see also SEC v. Goldsworthy*, No. Civ.A. 06-10012-JGD, 2008 WL 8901272, at *10 (D. Mass. June 11, 2008) (finding that "it would be inconsistent with the broad coverage provided by Section 17(a), as well as the fact that the requirements of Rule 17(a) are not limited to any particular phase of the selling transaction to conclude, as [defendant] does, that Rule 17(a)(3) does not apply to public documents traditionally relied on by investors in making purchase and sale decisions"). *Softpoint* did not require that the misstatement or omission "occur during and within" a specific securities transaction. *Cf.* ECF No. 20 at 10.[3]

The Court concludes that Section 17(a) does not require the SEC to allege that a defendant's material misstatements or omissions occurred during, within, or as part of a particular sale. Rather, the SEC must allege that the defendant made the false or misleading statements or material omissions in materials or communications typically relied upon by investors engaged in the ordinary market trading of securities, *Goldsworthy*, 2008 WL 8901272, at *1, while at the

---

[3] Tolstedt invites the Court to examine Section 17(a)'s legislative history while simultaneously arguing that "[l]egislative history is not necessary here given the clear statutory meaning." ECF No. 20 at 14 n.4. The legislative materials Tolstedt cites do not address the disputed language in Section 17(a) and therefore do not support her argument.

7

same time engaging in transactions to offer and sell those securities. The SEC's complaint satisfies this requirement. *See* Compl. ¶¶ 4, 6, 18, 21, 47-52, 60, 68, 74, 85, 102, 111, 118.

### B. "To Obtain Money or Property By Means Of" a Misrepresentation

Tolstedt also questions the meaning of Section 17(a)(2)'s term that a person offering or selling securities obtain money or property "by means of" an untrue statement or material omission. Tolstedt argues that this language requires that the misrepresentation or omission be "the mechanism naturally inducing [the purchaser of the securities] to part with money." ECF No. 20 at 16 (quoting *Loughrin v. United States*, 573 U.S. 351, 363 (2014)). The SEC responds that Section 17(a)(2)'s "by means of" requirement is "not the high hurdle Tolstedt suggests, but 'merely requires some causal relationship between the defendant's fraudulent statement or omission and the defendant's acquisition of money.'" ECF No. 26 at 19 (quoting *SEC v. Farmer*, No. 14-cv-2345, 2015 WL 5838867, at *8 (N.D. Tex. Oct. 7, 2015)). The Court agrees with the SEC.

In *Loughrin*, the defendant was convicted of federal bank fraud in violation of 18 U.S.C. § 1344(2), which prohibits "obtain[ing] any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 573 U.S. at 354. Interpreting the phrase "by means of," the Supreme Court explained that the phrase "typically indicates that the given result (the 'end') is achieved, at least in part, through the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." *Id.* (emphasis in original modified). Tolstedt asks the Court to apply the same definition of "by means of" here. She argues that Section 1344(2) and Section 17(a)(2) are textually similar and modeled on the same mail-fraud statute, such that the same definitions should apply. *Loughrin* itself, however, cautioned against the indiscriminate application of its analysis, explaining that "[l]anguage like 'by means of' is inherently elastic: It does not mean one thing as to all fact patterns – and certainly not in all statutes, given differences in context and purpose." *Id.* at 365 n.8. Tolstedt cites no case applying *Loughrin*'s interpretation of the bank fraud statute to

1  Section 17(a)(2), and this Court will not be the first.[4]  Importantly, the Supreme Court has already

2  stated that the actual statute at issue here – Section 17(a) – "was intended to cover any fraudulent

3  scheme in an offer or sale of securities, whether in the course of an initial distribution or in the

4  course of ordinary market trading."  *Naftalin*, 441 U.S. at 778.

5  Tolstedt also says that the SEC's interpretation untethers the making of an untrue statement

6  from the sale of an affected security such that the former need play no role in the latter.  ECF No.

7  20 at 16-17.  This is also incorrect.  Most courts have found that Section 17(a)(2)'s "by means of"

8  limitation means that the defendant's untrue statement or material omission be "used" to obtain

9  money.  *See SEC v. Stoker*, 865 F. Supp. 2d 457, 465 (S.D.N.Y. 2012) ("[A defendant] may be

10  held liable under 17(a)(2), though not under 10b-5, if[] he obtains money or property *by use* of a

11  false statement, whether prepared by himself or by another."); *Farmer*, 2015 WL 5838867, at *8

12  ("[T]he element of Section 17(a)(2) liability that the defendant 'obtain money . . . by means of' an

13  untrue statement or omission of material fact, merely requires some 'causal relationship' between

14  the fraudulent statement or omission and the defendant's acquisition of money.  A defendant may

15  be liable even 'if he obtains money or property in a highly roundabout manner.'" (internal

16  citations omitted)).  While this may not be the narrow construction Tolstedt would prefer, it does

17  require a connection between the relevant events.

18  Here, the SEC alleges that Tolstedt obtained money through the sale of her Wells Fargo

19  shares at a price that was inflated in part based on her material misstatements and omissions.

---

[4] Even if the Court were to adopt *Loughrin*'s gloss on this language, it is not clear it would help Tolstedt.  The Supreme Court intended by its definition to make clear only that "not every but-for cause will do."  573 U.S. at 363.  The Court gave the following example:

> If, to pick an example out of a hat, Jane traded in her car for money to take a bike trip cross-country, no one would say she "crossed the Rockies by means of a car," even though her sale of the car somehow figured in the trip she took.  The relation between those things would be (as the Government puts it) too "tangential[ ]" to make use of the phrase at all appropriate.

*Id.* (citation omitted).  The relationship between Tolstedt's alleged misstatements and the sale of her Wells Fargo shares is a far cry from the relationship between the sale of Jane's bicycle and her trip across the Rockies.

9

Compl. ¶¶ 4, 6-7, 116-18. In other words, she used false statements and the omission of material information to artificially inflate the value of the shares that she then sold for a premium. Accordingly, the complaint sufficiently alleges that she obtained money by means of material misstatements and omissions. *See SEC v. Hopper*, No. Civ.A. H-04-1054, 2006 WL 778640, at *12 (S.D. Tex. Mar. 24, 2006) ("It is reasonable to infer that those inflated trading volumes and revenues factored into the calculation of her bonuses, and hence, that [defendant] obtained all or part of those bonuses at least indirectly by means of the round-trip trading scheme in violation of § 17(a)(2)."); *SEC v. Killion*, No. CV H-16-621, 2017 WL 7052310, at *8 (S.D. Tex. Mar. 24, 2017) (refusing to dismiss claim where the SEC alleged that defendant "sold stock at inflated prices attributable to the false and misleading statements and omissions in SEC filings to which [defendant] had been a signatory or contributing party, and that it was 'by means of' the false or misleading statements and omissions that [defendant] '*obtained*' money in violation of § 17(a)(2)").

## CONCLUSION

For the foregoing reasons, Tolstedt's motion to dismiss is denied.

**IT IS SO ORDERED.**

Dated: June 28, 2021

_____
JON S. TIGAR
United States District Judge